AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Original

| LODGED | | FILED |
|---|---|---|
| CLERK, U.S. DISTRICT COURT | | CLERK, U.S. DISTRICT COURT |
| 06/16/2022 | | 6/16/2022 |
| CENTRAL DISTRICT OF CALIFORNIA BY: AP DEPUTY | | CENTRAL DISTRICT OF CALIFORNIA BY: KC DEPUTY |

# UNITED STATES DISTRICT COURT
for the
Central District of California

UNITED STATES OF AMERICA,

v.

JUAN LUIS TOSTADO, and
EDGAR MANUEL LAZCANO,

Defendants.

Case No. 5:22-mj-00391

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of June 15, 2022, in the county of San Bernardino in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1) | See attached affidavit |

This criminal complaint is based on these facts:

Please see attached affidavit.

☒ Continued on the attached sheet.

/s/
Complainant's signature

HSI Special Agent Andre D. LaMon Jr.
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 6/16/2022

Judge's signature

City and state: Riverside, California

Honorable Sheri Pym, U.S. Magistrate Judge
*Printed name and title*

AUSA: Courtney N. Williams (951-368-1473)

**AFFIDAVIT**

I, Andre D LaMon Jr, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against Juan Luis Tostado ("TOSTADO") and Edgar Manuel Lazcano ("LAZCANO") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2. This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES") seized from TOSTADO's car and LAZCANO's car on June 16, 2022, and is currently in the custody of Homeland Security Investigations, in Los Angeles, California, as described more fully in Attachment A:

    a. a white Apple iPhone with a black case ("SUBJECT DEVICE 1");

    b. a black Apple iPhone with a black case ("SUBJECT DEVICE 2"); and

    c. a black MAXWEST phone with a white piece of paper and telephone number 909-676-1875 on the back ("SUBJECT DEVICE 3").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject

Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5. I am a Special Agent ("SA") with Homeland Security Investigations ("HSI") and have been so employed since September 2018. In May 2019, I completed the Criminal Investigator Training Program and Homeland Security Investigations Special Agent Training at the Federal Law Enforcement Training Center ("FLETC") and was assigned to Special Agent in Charge, Los Angeles field office. I am currently assigned to the HSI Los Angeles Border Enforcement Security Taskforce – Metropolitan ("LA BEST Metro") and the Los Angeles Interagency Metropolitan Police Apprehension Crime Taskforce ("LA IMPACT").

6. During my training at FLETC in Glynco, Georgia, I was trained in conducting criminal investigations and I received hundreds of hours of comprehensive, formalized instruction for investigations into such matters as the smuggling of narcotics,

and other contraband; firearms trafficking and human trafficking; narcotics distribution and street gangs; money laundering; trade fraud; and assent identification, seizure, and forfeiture.  I have also participated in investigations concerning violations of immigration laws.  I am a graduate of California State University Long Beach, with a bachelor's degree in criminal justice.

7. In my experience in law enforcement, I have participated in numerous investigations involving smuggling and criminal street gangs, to include extortion, vehicle theft and vehicle smuggling, false document manufacturing and distribution, trafficking of firearms, and trade fraud. I have personally led numerous investigations involving the possession, manufacture, distribution, and importation of controlled substances from Mexico into the United States.  I have also gained experience in interviewing, debriefing, surveilling, and arresting persons involved in narcotics violations and criminal gang activity.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

8. On June 15, 2022, at approximately 9:56 a.m, TOSTADO applied for admission into the United States at the Otay Mesa, California Port of Entry, while driving a silver Toyota Camry bearing California license plate number 8PON439 ("Camry"). During the inspection of TOSTADO and the Camry, Customs and Border Protection ("CBP") Officers confirmed the presence of suspected narcotics concealed within a spare tire, inside the trunk.

9. In effort to uncover the intended destination and recipients of the concealed narcotics, SA Krystal Williams obtained a federal tracking warrant signed by the Honorable Mitchell D. Dembin, United States Magistrate Judge in the Southern District of California. HSI San Diego Narcotics Enforcement Team ("SDNET") installed an unmonitored tracker on the Camry. CBP allowed TOSTADO to enter into the United States with SDNET conducting continuous mobile and air surveillance.

10. At approximately 12:05 p.m., LA BEST Metro and LA IMPACT assumed control over surveillance in Corona, California, with assistance from SDNET. Over the next nine hours, TOSTADO drove the Camry around Riverside County, stopping at several locations. The spare tire remained in the trunk of the CAMRY throughout this time.

11. At approximately 9:20 p.m., TOSTADO drove to a residential area of San Bernardino where agents observed LAZCAN walking away from a dark colored Honda bearing California license plate number 8PAZ665 ("the Honda") and approach TOSADO's Camry. LAZCAN removed the spare tire from the trunk of the car and rolled it to his Honda and placed the spare tire on the back seat. Once LAZCAN entered his car, both cars attempted to drive away in separate directions. Agents and officers stopped the vehicles approximately 100 feet away from each other. Culver City Police canine ("K-9") sniffed both cars. The K-9 alerted at the back seat of the Honda. A search of the spare tire resulted in the discovery of approximately 11.8 kilograms of suspected fentanyl.

12. HSI Agents and LA IMPACT officers arrested TOSTADO and LAZCAN. Agents recovered SUBJECT DEVICE 1 from the dashboard of the Camry and SUBJECT DEVICE 2 and SUBJECT DEVICE 3 from the center console of the Honda.

### IV. STATEMENT OF PROBABLE CAUSE

13. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

    **A. TOSTADO Drove His Car to the Port of Entry and Officers Believe He Has Drugs Concealed Inside His Car**

14. On June 15, 2022, at approximately 9:50 a.m., while assigned to the Otay Mesa Port of Entry vehicle lane 11, CBP Officer Sixtos #26783 encountered TOSTADO inside in the Camry as he tried to enter the United States. CBP Officer Sixtos requested assistance from CBP K-9 Unit Officer La Pierre #24600 and his assigned narcotics and human detection K-9 Andy. CBP K-9 Officer La Pierre and K-9 Andy conducted a screen of the Camry. K-9 Andy alerted to the trunk and rear bumper of the car. CBP K-9 Officer La Pierre notified CBP Officer Sixtos about the alert. CBP Officer Sixtos asked TOSTADO if he had anything illegal inside the car. TOSADO said no twice.

15. During this time, CBP Officer Sixtos noticed TOSTADO was being very serious and avoiding eye contact. He asked TOSTADO if he was the owner of the vehicle he was driving and he said yes. TOSTADO told CBP Officer Sixtos he bought the vehicle a day before. CBP Officer Sixtos ran the TOSTADO border crossing history. TOSTADO actually had multiple crossings with

the same California license plate number as the Camry.  CBP Officer Sixtos also asked TOSTADO where he was traveling to and TOSTADO stated he was going to Home Depot next to the 805 Highway in San Diego.

16.  CBP Officer Sixtos asked TOSTADO to open his trunk, TOSTADO complied.  CBP Officer Sixtos identified a spare tire under the floorboard of the trunk.  CBP Officer Sixtos inspected the spare tire at which point CBP Officer Sixtos noticed the tire to be heavier than other tires he had previously inspected.  CBP Officer Sixtos removed the spare tire from the trunk and shook it on the ground.  While shaking the tire, he felt an object bouncing within the tire.  CBP Officer Sixtos put the spare tire back inside the trunk, closed it, and referred TOSTADO to the vehicle lot for secondary inspection.

17.  During secondary vehicle inspection, CBP Z-Portal System Operator Peterson #02442 scanned the car and analyzed the images, also discovering anomalies in the spare tire.

18.  At approximately 10:10 a.m., CBP Officer Del Rio #33015 conducted a fingerprint verification on TOSTADO, receiving positive results for previous encounters with other law enforcement agencies.  For instance, TOSTADO currently has a pending state charge with Riverside County Sheriff's Office, for possession to sell narcotics.

**B.  Agents Receive a Tracking Warrant for TOSTADO's Vehicle**

19.  At approximately 10:18 a.m., HSI SA Krystal Williams applied for a federal tracking warrant in the Southern District

of California while SDNET agents installed an unmonitored GPS tracking device on the Camry. Simultaneously, mobile and air surveillance was initiated by SDNET. In order to identify a stash house or potential coconspirators, TOSTADO was allowed to enter into the United States inside his Camry.

20. At approximately 11:00 a.m., United States Magistrate Mitchell D. Dembin signed the federal tracking warrant, and the tracker number was given to the surveillance teams following TOSTADO.

21. At approximately 12:00 p.m., TOSTADO arrived at the McDonalds located at 1215 Magnolia Drive, Corona, California 92879. HSI LA BEST Metro and LA IMPACT assumed primary control over surveillance with support from SDNET and Los Angeles Police Department ("LAPD") Air. TOSTADO exited his car and went inside McDonalds. His vehicle was not tampered with in any way while he was not occupying it. At approximately 12:35 p.m., TOSTADO exited McDonalds, entered the Camry and departed the location.

22. From approximately 12:35 p.m., to approximately 5:26 p.m., TOSTADO stopped at various outdoor shopping malls around Riverside and San Bernardino County. TOSTADO was not seen meeting with anyone during this time.

23. At approximately 5:28 p.m., TOSTADO entered the Motel 6 lobby located at 502 W Arrow Hwy, San Dimas, California 91773. Shortly thereafter TOSTADO exited and drove to the rear of the building, exited his car, and entered room 240 with what appeared to be a door key. No other people were observed entering or exiting the room.

7

24. At approximately 8:45 p.m., TOSTADO exited his room, entered his car, and drove to the Motel 6 lobby. Shortly thereafter TOSTADO entered the Camry and departed the location.

C. **Agents Find Fentanyl Inside Spare Tire**

25. At approximately 9:20 p.m., TOSTADO pulled into a residential neighbor near 706 North Terrace Road, San Bernardino, California 92410. HSI Special Agent Eric Selfridge #9235 observed LAZCANO's Honda parked in front of TOSTADO's Camry. SA Selfridge observed LAZCANO remove the spare tire from the trunk of the Camry, and roll the tire to his car, where he picked the tire up and placed it on the driver side back seat. LAZCANO then entered his Honda and both the cars attempted to drive away in separate directions.

26. At approximately 9:24 p.m., agents and officers stopped the vehicles on the same block the exchange occurred. SA Selfridge ordered LAZCANO to exit the vehicle. LAZCANO exited his car and was immediately placed in handcuffs by SA Selfridge. The spare tire was clearly visible on back seat. SDNET Officer Alex Vizcarra #27580 ordered TOSTADO out of his vehicle. TOSTADO immediately exited and laid on the ground. LA IMPACT Detective Pat Orta #965 placed TOSTADO in Handcuffs.

27. At approximately 9:34 p.m., Culver City K-9 Detective Kirk Kakuk #1138 and his assigned K-9 Ander conducted a sniff of the Honda and alerted to the drive side back seat where the spare tire had been placed by LAZCANO.

28. At approximately 9:38 p.m., HSI Special Agents Alexander Mednick #9246 and SA Selfridge removed the spare tire

from the Honda and cut it open. Approximately 11.8 kilograms of suspected fentanyl were found concealed within the spare tire. During booking the seized narcotics into temporary storage, one of the packages from the spare tire appeared darker in color and had a similar consistency to heroin. HSI SA Darren Valentine #3477 cut into the package to conduct a Nik Test for a field analysis. A hard blue colored substance consistent with fentanyl, came out of the sample. SA Valentine repackaged the narcotics for lab testing.

29. Agents recovered SUBJECT DEVICE 1 from the dashboard of TOSTADO's Camry and SUBJECT DEVICE 2 and SUBJECT DEVICE 3 from the center console of LAZCANO's Honda.

30. There were no other people found inside the Camry or the Honda. And no one other than TOSTADO had been seen inside the Camry the entire day.

**D. TOSTADO's and LAZCANO's Statements**

31. TOSTADO was advised of his Miranda rights and immediately invoked, stating he "wanted to live."

32. LAZCANO was advised his Miranda rights in Spanish and asked if he understood them. LAZCANO stated yes and verbally agreed to speak with agents and officer present. LAZCANO stated a friend asked him to do him a favor. That favor was to pick up the tire from TOSTADO. LAZCANO stated he did not know exactly what was in the tire but was being paid five hundred dollars and knew it was something illegal. LAZCANO stated he has done this before and was planning on taking the tire to his house.

LAZCANO stated he lives eight blocks from where the tire transfer occurred.

33. Neither subject consented to a search of the SUBJECT DEVICES.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

34. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

   a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

   b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

   c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the

seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

   d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

   e. Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

35. As used herein, the term "digital device" includes the SUBJECT DEVICES.

36. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

   a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained

in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

    c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

37. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

c. Given the number of digital device (three) and the fact that the primary language spoken by LAZCANO is in Spanish, which can only be analyzed for responsive content after being listened to in their entirety and translated, it may take

13

a substantial time to conduct a complete and accurate analysis of data on the digital devices.

38. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

    b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

    c. The person who is in possession of a device or has the device among his or her belongings is likely a user of

14

the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress TOSTADO's and LAZCANO's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of TOSTADO's or LAZCANO's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

39.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

40.  For all the reasons described above, there is probable cause to believe that TOSTADO and LAZCANO have committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 16 day of June,
2022.

_____
UNITED STATES MAGISTRATE JUDGE